Case 23-1250, Document 94, 04/10/2024, 3615439, Page1 of 75

NO. 23-1215 (L); NO. 23-1250 (XAP)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

DONNA BROWE, TYLER BURGESS, BONNIE JAMIESON, PHILIP
JORDAN, ESTATE OF BEVERLY BURGESS,

*Plaintiffs/Appellants/Cross-Appellees,*

LUCILLE LAUNDERVILLE,

*Plaintiff/Counter-Defendant/Appellant/Cross-Appellee,*

*v.*

CTC CORPORATION, BRUCE LAUMEISTER,

*Defendants/Counter-Claimants/Appellees/Cross-Appellants.*

---

## BRIEF OF DEFENDANTS / COUNTER-CLAIMANTS /
## APPELLEES/CROSS-APPELLANTS CTC CORPORATION
## AND BRUCE LAUMEISTER

---

Primmer Piper Eggleston & Cramer PC
30 Main Street, Suite 500
Burlington, VT 05401
(802) 864-0880

Devine, Millimet & Branch P.A.
111 Amherst Street
Manchester, NH 03101
(603) 669-1000
*On the Brief*

**Co-Counsel for CTC Corporation and
Bruce Laumeister**

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant/Counter-Claimant/Appellee/Cross-Appellant CTC Corporation states the following:

CTC Corporation was a Vermont corporation that dissolved on October 16, 2014 and has not operated since its dissolution. No publicly held company owns or owned 10% or more of CTC Corporation's stock.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS ...................................................................................... iii

TABLE OF AUTHORITIES ................................................................................ vi

STATEMENT OF APPELLATE JURISDICTION ................................................. 1

ISSUES PRESENTED ......................................................................................... 2

STANDARD OF REVIEW .................................................................................. 3

STATEMENT OF THE CASE ............................................................................. 4

    I.      The Second Circuit's Prior Rulings in this Case Dictate Resolution of this Appeal ............................................................................................... 4

    II.    Factual Background ................................................................................ 5

        i.   The Plan ................................................................................ 8

        ii.  CTC's Decline and Diversion of Plan Assets ................................... 11

        iii. Launderville and Browe's Side-Deals with Laumeister ..................... 12

        iv. Launderville's Self-Dealing ............................................................. 17

        v.  Launderville's Lawsuit ...................................................................... 18

        vi. Procedural History ........................................................................... 19

SUMMARY OF THE ARGUMENT ..................................................................... 24

ARGUMENT ON CROSS-APPEAL .................................................................. 30

    I.      Browe and Launderville Cannot Recover Benefits Under the Plan Like Other Plan Participants Because Their Recovery Is Barred By The Statute of Limitations ........................................................................................... 30

A. *Launderville and Browe are not Plan "Participants" and should not have been considered as such in the District Court's Remedial Scheme* .............................................................................. 30

B. *The District Court's Remedial Scheme is unreasonable because it renders the statute of limitations defense meaningless* ..................... 32

II. As This Court Correctly Found, The Plan Was Never Terminated, So 29 U.S.C. § 1344 Does Not Apply To This Case And The District Court Erred In Applying 29 U.S.C. § 1344 And In Treating Its Allocation Scheme As Tolling The Statute Of Limitations ...................................... 34

A. *As this Court found, the Plan was never terminated* .......................... 35

B. *Termination of a plan does not extinguish the existence or application of a statute of limitations defense* ....................................................... 37

C. *Section 1344 is a mechanical allocation scheme and does not establish any entitlement to new benefits* ........................................... 38

III. Launderville Should Not Be Allowed To Recover Benefits Because She Engaged In Self-Dealing And Breached Her Fiduciary Duty To The Plan As A Representative Of The Plan Sponsor And As Plan Administrator And Co-Fiduciary ..................................................................................... 40

A. *As this Court highlighted in 2021, Launderville engaged in classic self-dealing in violation of ERISA* ...................................................... 40

B. *Launderville ignored her affirmative duty to notify Plan participants regarding the misuse of Plan funds, among other duties* ................... 41

C. *Launderville impermissibly received a kickback by entering into a side deal with Laumeister, in violation of ERISA* .............................. 42

D. *Launderville is also liable as a Plan co-fiduciary pursuant to ERISA* ................................................................................................... 43

iv

E. *Launderville does not have a colorable claim to benefits under the Plan because the damages resulting from her fiduciary breaches exceed her purported account balance in the Plan* ........................... 44

OPPOSITION TO ARGUMENTS ON APPEAL ................................................. 46

I. The District Court's Order Offsetting Launderville's Plan Benefits Does Not Violate ERISA……………………………………………… …..46

    A. *Both case law and the principles of equity under ERISA require that any amount found to be owed to Launderville by the Plan be offset against the amount she owes the Plan for breaching her fiduciary duties*…………………………………………………….. 46

    B. *An exception to ERISA's anti-alienation provision applies to allow for offset of Launderville's benefits and such offset furthers ERISA's equitable purpose of deterring fiduciary breaches*………………… 49

II. The 50/50 Allocation Of Liability Between Laumeister And Launderville Follows Applicable Trust Law……………………………………….51

    A. *If such an inquiry is deemed necessary, a determination as to the allocation of any liability to CTC is not ripe on appeal*…………......52

    B. *Neither this Court nor the District Court allocated any share of liability for contribution purposes to CTC*…………………………..53

    C. *Neither Laumeister nor CTC enjoyed any benefits as a result of a fiduciary breach, only Launderville did*……………………………..54

III. The District Court Accounted For All Growth In The Plan Fund Balance And Should Be Affirmed……………………………………………….58

IV. Launderville And Browe's Claims For Benefits Were Not Timely And Are Barred By The Statute Of Limitations……………………………..60

CONCLUSION. ................................................................................................. 63

CERTIFICATE OF COMPLIANCE. ................................................................ 65

# TABLE OF AUTHORITIES

## CASES

*Abbott Labs. v. Gardner,* 387 U.S. 136 (1967) ........................................ 52

*Alessi v. Raybestos-Manhattan, Inc.* 451 U.S. 504 (1981) ..................................... 26

*American Tobacco Co. v. Patterson,* 456 U.S. 63 (1982) ..................................... 33

*AMSAT Cable Ltd. v. Cablevision of Conn.,* 6 F.3d 867 (2d Cir. 1993) .......... 51, 52

*Belnomi v. Sonoco Prods. Co.,* 686 F. Supp. 520 (E.D.Pa.1988) .......................... 33

*Browe v. CTC Corp.*, 15 F.4th 175 (2d Cir. 2021)……… 1, 4, 7, 10, 19, 20, 21, 24, 27, 28, 30, 32, 34, 35, 41, 43, 44, 51, 52, 53, 57, 58, 59

*Burke v. PriceWaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76 (2d Cir. 2009) ........................................................................................ 60

*Califano v. Sanders,* 430 U.S. 99 (1977) ................................................. 52

*Carey v. Int'l Bhd. of Elec. Workers Local 363 Pension Plan*, 201 F.3d 44 (2d Cir. 1999) ................................................................................................ 33, 61

*Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12 (2d Cir. 1991) ................................................................................................ 50, 53

*Chuck v. Hewlett Packard Co.*, 455 F.3d 1026 (9th Cir. 2006) ...................... 31, 32

*Citigroup Pension Plan ERISA Litig.,* No. 05 CIV. 5296 (SAS), 2007 WL 4205855 (S.D.N.Y. Nov. 20, 2007) .................................................................. 36

*Clancy v. United Healthcare Ins. Co.*, 643 F. Supp. 3d 589 (E.D. Va. 2022).......28, 29, 37

*Connecticut v. Duncan*, 612 F.3d 107 (2d Cir. 2010).............................................. 52

*Dougherty v. Carver Fed. Sav. Bank,* 112 F.3d 613 (2d Cir. 1997) ...................... 33

*Ehrlich v. NYNEX Corp.*, 949 F. Supp. 213 (S.D.N.Y. 1996) ................................ 36

*Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).................................. 31

*Frommert v. Conkright*, 433 F.3d 254 (2d Cir. 2006) ............................................ 35

*Glus v. G.C. Murphy Co.*, 629 F.2d 248 (3d Cir. 1980) ......................................... 50

*Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-CV-282 JCH, 2012 WL 10242276 (D. Conn. Sept. 27, 2012) ................................................... 56

*Hirt v. Equitable Ret. Plan*, 441 F. Supp. 2d 516 (S.D.N.Y. 2006)........................ 36

*Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999)....... 3

*L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57 (2d Cir. 2013) ................................................................ 31

*Lehr v. Perri*, No. 2:17-CV-1188 WBS AC, 2019 WL 1556672 (E.D. Cal. Apr. 10, 2019).................................................................................................. 47, 48

*Lewis v. Pension Benefit Guar. Corp.*, 912 F.3d 605 (D.C. Cir. 2018) ............ 38, 39

*LoPresti v. Terwilliger*, 126 F.3d 34 (2d Cir. 1997) ............................................... 3

*Masters & Pilots Pension Plan*, 957 F.2d 1020 (2d Cir. 1992)............................. 50

*Mead Corp. v. Tilley*, 490 U.S. 714 (1989)................................................. 29, 34, 38

*Miller v. Fortis Benefits Ins. Co.*, 475 F. 3d 516 (3d Cir. 2007)............................. 62

*Modzelewski v. Resolution Trust Corp.*, 14 F.3d 1374 (9th Cir. 1994) ................. 27

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359 (1980).................. 26

*Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682 (2d Cir. 2013) ................... 52

*Normann v. Amphenol Corp.*, 956 F. Supp. 158 (N.D.N.Y. 1997)........................ 36

*Parker v. Bain*, 68 F.3d 1131 (9th Cir. 1995) ................................................. 44, 48

*Tatum v. R.J. Reynolds Tobacco Co.,* No. 1:02CV00373, 2011 WL 2160893 (M.D.N.C. June 1, 2011) ................................................................ 36

*Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568 (1985) ...................... 52

*Veltri, v. Building Service 32B-J Pension Fund* 393 F.3d 318 (2d Cir. 2004)...... 61

*Youngberg v. The Bekins Co.*, 930 F. Supp. 1396 (E.D. Cal. 1996) ................ 46, 47

*Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548 (9th Cir. 1990) .......................... 3

## **STATUTES**

28 U.S.C. § 1291 ................................................................................................. 1

ERISA § 3, 29 U.S.C. § 1002 ............................................................. 26, 30, 31, 32

ERISA § 206, 29 U.S.C. § 1056 .......................................................................... 49

ERISA § 405, 29 U.S.C. § 1105 .......................................................................... 43

ERISA § 406, 29 U.S.C. § 1106 ................................................................ 40, 42, 50

ERISA § 502, 29 U.S.C. § 1132 .......................... 5, 8, 19, 21, 31, 32, 33, 46, 47, 60

ERISA § 4044, 29 U.S.C. § 1344 ........ 2, 4, 8, 21, 26, 27, 28, 29, 34, 37, 38, 39, 63

12 V.S.A. § 511 .................................................................................................. 60

## **OTHER AUTHORITIES**

RESTATEMENT (SECOND) OF TRUSTS § 258 ............................................................. 54

RESTATEMENT (THIRD) OF TRUSTS § 102 ......................................................... 54, 56

## STATEMENT OF APPELLATE JURISDICTION

This appeal arises from the United States District Court for the District of Vermont's (the "District Court"): (i) Supplemental Findings of Fact, Conclusions of Law, and Remedial Order entered on December 16, 2022 (SA1) (the "Remedial Order"); (ii) Opinion and Order entered on April 17, 2023 (SA29) (the "Post Remedial Order"); (iii) Entry Order entered on July 11, 2023 (SA40) (the "Entry Order"); and (iv) Final Judgment entered on August 18, 2023 (SA43) (the "Final Judgment"), all of which were under consideration by the District Court on remand from the September 29, 2021 Opinion of the United States Court of Appeals for the Second Circuit (the "Second Circuit"), *Browe v. CTC Corp.*, 15 F.4th 175 (2d Cir. 2021).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Plaintiffs/Counter-Defendants/Appellants/Cross-Appellees Donna Browe ("Browe"), Lucille Launderville ("Launderville"), Tyler Burgess, Bonnie Jamieson, Philip Jordan and the Estate of Beverley Burgess (collectively, "Appellants") filed a Notice of Appeal from the Final Judgment on August 31, 2023 (the "Appeal"). Defendants/Counter-Claimants/Appellees/Cross-Appellants CTC Corporation ("CTC") and Bruce Laumeister ("Laumeister") (collectively, "Cross-Appellants") filed a timely Notice of Cross-Appeal on September 8, 2023 (the "Cross-Appeal").

## ISSUES PRESENTED ON CROSS-APPEAL

1.Whether the District Court erred in determining Browe and Launderville may recover benefits under the subject deferred compensation plan (the "Plan") on the same terms as other Plan participants under 29 U.S.C. § 1344, despite the District Court's finding that their claims to recover benefits under the Plan are barred by the applicable statute of limitations.

2.Whether the District Court erred in allowing Launderville, a director and officer of CTC Corporation, to recover benefits despite finding that Launderville engaged in self-dealing and breached her fiduciary duty to the Plan as a representative of the Plan sponsor and as the Plan administrator and co-fiduciary.

3.Whether the District Court erred in applying 29 U.S.C. § 1344 to award Browe and Launderville benefits under the Plan when the Plan, as this Court previously found, was never terminated.

2

## STANDARD OF REVIEW

The standard of review for all issues in this appeal is *de novo*. *LoPresti v. Terwilliger*, 126 F.3d 34, 39 (2d Cir. 1997); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243 (2d Cir. 1999) ("[I]n the absence of an explicit reservation of discretionary authority to an ERISA plan administrator to determine eligibility or to construe the terms of the plan, the *de novo* standard of review applies to all issues concerning denial of benefits."); *Ziegler v. Conn. Gen. Life Ins. Co.*, 916 F.2d 548, 550 (9th Cir. 1990) ("The circuit courts of appeals apply *de novo* review to a district court's determination of the applicable statute of limitations in the benefits litigation context.").

## STATEMENT OF THE CASE

### I. The Second Circuit's Prior Rulings in this Case Dictate Resolution of this Appeal.

The central issues involved in this appeal have already been decided by this Court and should be reaffirmed. In 2021, this Court ruled that:

1. The subject Plan was *never* terminated;

2. Launderville is liable as a breaching co-fiduciary who engaged in "classic self-dealing;"

3. Liability under the Employee Retirement Income and Security Act of 1974 ("ERISA") among Plan co-fiduciaries is joint and several; and

4. The restoration award to plan participants should be calculated from 2004 through the date of judgment because the Plan was never terminated.

*Browe*, 15 F.4th at 197–201. Those prior rulings largely dictate resolution of the remaining issues before this Court on appeal, which were before District Court on remand, as follows:

1. Because this Court found that the Plan was never terminated, the mandatory allocation provisions of 29 U.S.C. § 1344 do not apply and benefits should not be paid to Browe or Launderville, whose claims are time barred; the District Court's decision to the contrary should be reversed (Cross-Appeal Issues 1 and 3);

2. Because 29 U.S.C. § 1344 does not toll the statute of limitations period or create any new entitlement to benefits on the part of Browe or Launderville, the District Court's decision to the contrary should be reversed, even if this Court had ruled the Plan had been terminated (Cross-Appeal Issue 1);

3. Because this Court found that Launderville is a breaching co-fiduciary who engaged in "classic self-dealing," she should not

4

recover any benefits from the plan and her claim to $189,514.00 in benefits should be denied; the District Court's decision to the contrary should be reversed (Cross-Appeal Issue 2);

4. Because Launderville is not entitled to payment of Plan benefits, the issue of offset need not be addressed; nonetheless, the District Court's order of offset in contribution to Laumeister does not violate ERISA and should be affirmed (Appeal Issue 1);

5. The District Court's 50/50 allocation of liability between Launderville and Laumeister follows applicable trust law and should be affirmed; CTC has no liability, but if such a consideration is necessary it should be remanded to the District Court (Appeal Issue 2);

6. Based on this Court's ruling and mandate to the District Court to recalculate losses since 2004 using $350,603.00 as a base amount, and **not** to find a different base amount as of a different date, the District Court's restoration calculation should be affirmed (Appeal Issue 3); and,

7. Browe and Launderville's untimely claims under 29 U.S.C. § 1132(a)(1)(B) for benefits in the amounts of $94,461.00 and $189,514.00, respectively, are barred by the applicable six-year statute of limitations; the District Court's findings on this issue should be affirmed and therefore the restoration award should be reduced from $829,915.00 to $545,940.00 (Appeal Issue 4).

## II.    **Factual Background.**

This appeal involves a deferred compensation plan established more than three decades ago by a well-intentioned, but perhaps poorly advised, Vermont business owner for the benefit of key employees. The account established for the Plan with Massachusetts Mutual Life Insurance Company ("MassMutual") was funded entirely by employer contributions. A207, A208. The Plan was intended to

5

be a "top hat" plan exempt from certain protections of ERISA and was treated as such by Laumeister and his Chief Financial Officer and Treasurer, Wayne Massari ("Massari"), who had assisted with the drafting of Plan documents and establishment of the Plan.  A206–A208.

CTC and its affiliated entities were engaged in the business of photo finishing and printing.  When CTC encountered financial difficulties because of the advent of digital photo technology, years after the Plan had been established, Plan funds were used to meet payroll expenses, retain employees, and otherwise keep CTC afloat. A200, A215.

More than two years after CTC dissolved and ceased doing business, this litigation commenced in the District Court and was spearheaded by Launderville, a former President, Chief Operating Officer ("COO") and Director of CTC who was the very person responsible for diverting Plan assets to pay CTC operating costs. During the course of the District Court proceedings, the District Court found (in 2018) that the Plan did not qualify as a "top hat" plan as it was not limited to a select group of management or highly compensated employees.  A243.  Because the Plan did not qualify as a "top hat" plan, it was subject to the protections of ERISA, contrary to the advice given to Laumeister by Massari when he initially established the Plan.  A243.

6

After almost nine years of proceedings, and approximately fourteen years after the Plan funds were exhausted (*see* A215), this litigation continues, despite the good faith payment in full by Laumeister's Estate[1] (the "Estate") to all but two former employees, Launderville and Browe because their claims to benefits are at issue in this appeal.  SA40.  In August and September of 2023, the Estate made payments totaling $545,941.00 to fourteen participants in the Plan (only thirteen have cashed the checks remitted), as required by the District Court's Entry Order. *See* SA40; A372.  The Estate made those payments from its own assets because CTC has been dissolved and has no assets.  *See* A372.

The remaining two former employees whom Cross-Appellants have not paid—one the President, COO and Director of CTC responsible for diverting plan assets (Launderville), and the other CTC's Accounting Manager (Browe)—were both fully aware of and involved in the use of Plan assets to pay company operating expenses, as found by the District Court.  A237.  In 2008, both tried to take advantage of their insider status to negotiate side deals with Mr. Laumeister to enrich themselves, to the detriment of other Plan participants.  A246–A247.  As a result, the District Court found that their claims for benefits are barred by the applicable six-year statute of limitations. *Browe*, 15 F.4th at 192; SA2; A320–A321.

---

[1] Mr. Laumeister passed away in May of 2023 and his interests in this appeal are represented by his estate.

Despite this finding, the District Court erroneously held that Browe and Launderville are still entitled to payment of their benefits because the Plan had been terminated and the mandatory allocation provisions of 29 U.S.C. § 1344 require that all vested benefits be distributed to Plan participants on termination, notwithstanding that Launderville and Browe's individual benefits claims under 29 U.S.C. §1132(a)(1)(B) were time-barred. SA18. The District Court stated that "while Plaintiffs Browe and Launderville may be precluded from bringing a legal claim for recovery of benefits, they are otherwise similarly situated to all other Plan Participants and should be treated the same, subject to Plaintiff Launderville's liability for contribution and indemnification." SA19.

As argued below, Launderville and Browe's entitlement to payment of the deferred compensation benefits under the Plan is still at issue, and is central to this appeal.

i.   The Plan.

The Plan was originally adopted in 1990 by CTC. A206. Laumeister incorporated CTC in 1979 as a photo-finishing and processing business headquartered in Bennington, Vermont with photo labs in Vermont, Connecticut,

8

Massachusetts, New Hampshire and New York. A200. CTC operated from 1979 until 2014, when it dissolved. A200, A215.

CTC established the Plan as an incentive to retain key employees. A206. Massari, CTC's Treasurer, Chief Financial Officer, and a Director until he suffered a stroke in 1999, drafted the Plan. A206. To fund the Plan, CTC opened an account with MassMutual, into which it deposited funds from which it intended to pay deferred compensation. A207. CTC regularly deposited funds into the Plan account until it began to experience financial difficulties in the early 2000s. A214. CTC employees never contributed any of their own money to the Plan account. A244, A247.

By 1997, Laumeister became dissatisfied with the investment returns generated by the MassMutual account. A207. CTC terminated its relationship with MassMutual and adopted a new Plan agreement dated August 20, 1997, also drafted by Massari, which amended and superseded the 1990 Plan agreement. A207. CTC subsequently opened an account with Mission Management & Trust, which held the Plan funds until exhaustion. A213–A214.

Both the 1990 and 1997 Plan Agreements state, in relevant part, that they are intended to provide an "employer paid fund," to which CTC "agrees to contribute funds which will . . . be payable in accordance with Section 6" thereof. A208. Section 6 of both agreements provides that funds will be payable upon the

9

retirement, defined as "withdrawal from full time active employment at or after age 65," or death of the participant (in the latter case, with funds being paid to the participant's designated beneficiary generally over a 120-month payout period). A208–A209.

Although intended to be a "top hat" plan, the District Court determined, and this Court affirmed, the Plan did not qualify as a "top hat" plan exempt from certain protections of ERISA because participation in the Plan was not limited to a select group of management or highly compensated employees. A243; *Browe*, 15 F.4th at 183.

Under the Plan, CTC's Board of Directors were Plan administrators and were authorized to make "[a]ll decisions concerning withdrawal, payment, method of payment, [and] investments of funds[.]" A209; A189. Participants in the Plan have the same rights as a "general creditor of the Employer[,] . . . and then solely to the extent of the net value of the Participant's deferred compensation account." A209; A191–A192. Pursuant to the Plan, the Plan administrators were required to "advise the Participant[s] of the actual cash value of their account annually, and at the time of retirement." A209; A191.

From 1999 until 2008, Launderville and Laumeister comprised CTC's Board of Directors and Plan administrators. A205–A206. Launderville began her employment with CTC at its inception in 1979. A200. She was initially employed

10

in customer service and was eventually promoted to, among other positions, President of CTC, Director, and General Manager/COO. A200. She resigned from CTC in 2008 for a position at Plasan Industries. A200. Laumeister was CTC's sole shareholder, Chief Executive Officer, and Chairman of the Board of Directors throughout its existence. A200. He was CTC's President from 1979 until 2000 and from 2008 until its dissolution in 2014. A200.

ii.    CTC's Decline and Diversion of Plan Assets.

CTC began to encounter financial trouble in the early 2000s with the arrival of digital film and cameras. A215. From 2004 until its dissolution in 2014, CTC's cash flow from its annual sales became insufficient to support its operating expenses. A215. As a result, Laumeister and Launderville diverted monies deposited in the Plan account to CTC's general business account and used those funds to pay CTC's general business expenses, including payroll. A215.

Launderville and Browe, the manager of CTC's accounting department, periodically advised Laumeister regarding the extent of CTC's operating shortfalls to determine the amount to be transferred from the Plan account to CTC's operating account. A215. Launderville was directly responsible for making these transfers, but never notified Plan participants about such diversion or took any other steps to minimize the harm to Plan participants. SA20. When CTC's cash reserves were exhausted, Laumeister made a series of personal loans to CTC to fund operating

11

expenses.  SA23; A215.  Launderville and Browe were aware of both the use of the Plan assets and the personal loans from Laumeister totaling approximately $600,000 to meet payroll and other CTC operating expenses.  SA9; A215.

In 2004, Laumeister told Launderville "that because of the deteriorating financial condition of CTC, the [P]lan was being terminated and the funds would be used to pay business operating expenses."  A215.  However, Laumeister and Launderville did not "otherwise announce[ ] the termination of the [ ] Plan."  A215. In approximately 2006, Laumeister convened an employee meeting attended by Launderville and others during which he explained CTC was in financial distress. A215.  He proposed employees accept a twenty percent pay-cut that was apparently accepted by those employees who chose to remain in CTC's employ.  A215.  By February of 2008, the only remaining employees of CTC who were Plan participants were Browe and Launderville.  A215.  At the time, CTC's cash flow was insufficient to pay its general creditors or to fund obligations under the Plan.  A215.  Both Browe and Launderville were aware of that fact.  A215.

iii.    Launderville and Browe's Side-Deals with Laumeister.

In 2008, Launderville voluntarily left employment at CTC and accepted employment at Plasan Industries in Bennington, Vermont.  A219.  Before accepting her new position, Launderville emailed Laumeister on February 24, 2008 and stated in relevant part: "I have been offered a position. I think it is a good move for me, but

before I accept, I wonder what this will mean regarding my Deferred Compensation."
A219.   Laumeister responded to her inquiry, in pertinent part, as follows: "My
intention is exactly what I showed you before. I am putting in my will and trust and
instructing Mission Trust to pay your d.c. when you are 65 or when I check out.
Donna [Browe]'s will be in the same instruction."   A219.

By 2014, Laumeister's outstanding unpaid loan balance to CTC was
approximately $600,000.  A215.  Because of the significant decline in CTC's sales,
he realized that CTC could not repay those loans and decided he would no longer
try to keep CTC operational.   A215.   On October 6, 2014, at the direction of
Laumeister, CTC ceased doing business and filed Articles of Dissolution with the
Vermont Secretary of State.  A215.

At some point prior to April 4, 2015, Laumeister, Launderville, and Browe met
at a restaurant in Bennington, Vermont.  A225.  At that meeting, Laumeister agreed
to include a $90,000 bequest for Launderville and a $35,000 bequest for Browe in his
will.  A225.  Laumeister executed a Last Will and Testament dated June 17, 2010,
which stated, in relevant part:

> I direct that my stock in CTC Corp be sold or liquidated as
> soon as possible after my death, together with the land and
> buildings known as 252 Benmont Avenue, Bennington,
> Vermont. I give, devise and bequeath the sum of
> $90,000.00 from the proceeds of that sale to Lucille
> Launderville of Shaftsbury, Vermont if she survives me. .
> . . I give, devise and bequeath the sum of $35,000.00 to
> Donna Browe, of Bennington, Vermont if she survives me.

13

A225.

By email dated April 4, 2015, Launderville wrote to Laumeister that her employer, Plasan, was moving and it "looks like I will be pushed into retirement about a year or so sooner than anticipated." A225. In this email, she inquired about the Plan as follows:

> I am wondering about the deferred compensation which I had counted on in retirement. We can't make any firm plans until I have a complete understanding of where this issue stands. I understand that you have bankrupted CTC, but hope that you can find it in your heart to take care of the commitment which was made so many years ago. I gave my heart and soul to the business and hope that you feel that I impacted the business and you in a very dedicated and positive way.

A225–A226.

In relevant part, Laumeister responded to Launderville's request as follows:

> I did not bankrupt CTC. Digital and stupid Kodak torpedoed the industry. I did fight for more years than I should have to try to save CTC and it cost me more than $600,000, the loans from me to CTC which will never be repaid.
>
> I did promise to personally fulfill your deferred comp, though it was a CTC responsibility. As you should remember, however, the payment is contingent on 252 Benmont, the store, warehouse and garage on about an acre, providing either a sale or leasing to provide the funds. That is my personal property, but I was and still am willing to use it to provide the $$ for you and Donna.
>
> The problem is timing, which does not appear to be soon. The Benmont bridge reconstruction has killed interest in retail for now, after I spent over $10,000 to renovate the bldg., plus annual taxes of over $6000 and insurance of

14

almost $2000/yr. Hoisington believes it is a good buy at my $190,000 listing or $220,000 with the back bldgs and land. I have even said I'd lease it to a good tenant, starting at $1000/month, triple net to get a long term tenant who could bring the rent up to $2000/month where it should be in a few years. NO TAKERS SO FAR.

I know that you probably feel that I could afford to pay you out of my own funds, but sadly, I'm in tough shape now.

\* \* \*

I'm sorry if all these problems upset your retirement plans. As one who has worked from age 13 to 80, and can't slow down now, I would advise you both to keep working, do not tap soc. sec. until 65 as you'll lose thousands over the next 20 years[.] Both of you have the ability to find [employment] in Bennington County, and I believe that 252 B will eventually sell.

A226.

Thereafter, Laumeister agreed to increase the bequest in his will to Browe. *Id.*

He revised his Last Will and Testament dated April 25, 2014 to provide the following increase for Browe:

I direct that the land and buildings known as 252 Benmont Avenue, Bennington, Vermont, be sold as soon as possible after my death. From the net sales proceeds, I direct that the sum of $90,000 be paid to Lucille Launderville of Shaftsbury, Vermont, if she survives me. If she does not survive me, I direct that the sum of 90,000 to be paid to her surviving husband or, if he does not survive her, then to her son. I further direct that $60,000 from the net proceeds of said sale shall be paid to Donna Browe of Bennington, Vermont, if she survives me. If she does not survive me, then I direct that said sum be paid to her husband, Tom, if he survives me. In the event that the sale of 252 Benmont, Bennington, Vermont does not generate

15

net proceeds to satisfy these bequests, I direct that such parties' share be reduced proportionately based on the amount that the net sale proceeds are less than 150,000.

A226–A227.

Laumeister provided Launderville and Browe with copies of the page in his will where their bequests are mentioned. A227. They raised no objection in 2010 or 2014. A227. Laumeister credibly testified that the amounts of the bequests were proposed by Launderville and Browe based upon what they believed was in their deferred compensation accounts and that he thought the amounts were "reasonable." A227. He further contended that as any obligation belonged to CTC, he had no personal obligations to them and he considered his bequests a "gift[.]" A227. Laumeister considered this lawsuit a rejection of the offers he made to Launderville and Browe. A227. Neither Launderville nor Browe offered any evidence to the contrary. A227.

Thus, the evidence demonstrates Launderville and Browe knew of the breaches of fiduciary duties under the Plan and the failure to pay benefits due under the Plan no later than February of 2008. SA9. Although Browe was not a Plan fiduciary, she was aware Launderville, Laumeister and CTC had failed to pay Plan benefits. SA9. She, too, attempted to arrange a side deal with Laumeister whereby she would receive her Plan benefits from him personally. SA9. Although Launderville and Browe were aware they had a claim against CTC for non-payment

16

of their Plan benefits, they decided to forego it by seeking those benefits directly from Laumeister.  SA9.

It was not until over seven years later, while employed at Plasan Industries in Human Resources, that Launderville contacted counsel in order to pursue an ERISA-based claim against CTC and Laumeister.  A219.  In 2015, she also contacted each of the other plaintiffs in the lawsuit and encouraged them to join her in a lawsuit against CTC and Laumeister.  A206.

 iv. Launderville's Self-Dealing.

When approached in 2004 by Tyler Burgess and Bonnie Jamieson in regards to payment of deferred compensation owed to their deceased mother's estate, Launderville affirmatively misled those beneficiaries of the Plan as to the availability of benefits.  SA7.  She falsely assured them there were no benefits available even when she knew other Plan Participants (namely, Massari, Hope Leonard, William Elliot, and Eileen Bliss) were receiving benefits at the time.  SA7.

Launderville did not advise the beneficiaries of Burgess' Estate, or any other beneficiaries or Plan Participants for that matter, of any legal claim or remedy they might pursue against CTC or the Plan for benefits, despite the fact that she was the Plan administrator and as such, it was her responsibility under ERISA to do so.  SA6–SA7.

Launderville was aware of and facilitated the use of Plan assets to fund CTC's operating expenses at no cost to herself and to her ongoing benefit through the receipt of a substantial salary. SA9. In contrast, Laumeister used both the Plan assets as well as his own funds to keep CTC operational and to provide continuing employment to CTC employees, including Plan participants. SA9. Laumeister had no personal benefit from continuing to operate CTC at a deficit. SA9.

Launderville, on the other hand, sought to secure payment of her Plan benefits directly from Laumeister in a "side deal" while hindering or failing to inform other Plan participants of potential claims relating to her and Cross-Appellants' breaches of their fiduciary duties through the misuse of Plan assets and the wrongful denial of benefits to participants. SA9. It was not until Launderville determined that Laumeister had reneged on his personal promise to pay her Plan benefits that she contacted other Plan participants to file this lawsuit on December 28, 2015. SA9.

v.    Launderville's Lawsuit.

At the end of 2015, despite being culpable for improperly diverting Plan funds into CTC's operating account, Launderville commenced this action in the District Court against CTC and Laumeister for breach of fiduciary duty and wrongful denial of Plan benefits. *See* A37 (the "Complaint"). Browe, two other Plan participants and two heirs of the Estate of Beverly Burgess, a Plan participant who passed away in 2004, joined Launderville as plaintiffs in the action. A37. Laumeister filed a

18

counterclaim against Launderville as a co-fiduciary under ERISA for contribution and indemnification. *See* A62.

After almost nine years of litigation in the District Court and a previous appeal to this Court, the District Court on remand issued several orders that culminated in a final judgment entered on August 18, 2023. *See* SA43. The focus of this Cross-Appeal is the District Court's findings concerning Launderville and Browe's claims for benefits under the Plan and the District Court's ruling that Launderville and Browe are entitled to benefits notwithstanding the concurrent finding that Launderville and Browe's benefits claims under 29 U.S.C. § 1132(a)(1)(B) are time-barred due to the expiration of the applicable six-year statute of limitations period.

## vi. Procedural History.

This case is returning to the Second Circuit for a second time after a remand to the District Court. On September 29, 2021, this Court issued an Opinion that reversed the District Court in part, affirmed the District Court in part, and remanded the case to the District Court for further proceedings to determine each Plan participant's eligibility for Plan benefits, and to determine the amount Launderville is liable to Laumeister for contribution. *Browe*, 15 F.4th 175. The Court in the 2021 Decision held that "*while we do not hold that Plaintiffs have established their entitlement to benefits as a matter of law*" the District Court's decision must be remanded for further proceedings to:

19

> [c]raft a remedial scheme that takes into account the vested rights of participants after conducting, to the extent necessary, any additional fact-finding. That remedial scheme should include a mechanism enabling Plan participants not parties to this suit to receive any benefits to which they may be entitled, similar to that adopted by the district court in the first instance. The district court should also provide for an appropriate disposition of excess funds, if any, remaining after claims have been paid out.

*Id.* at 203, 206–07.

This Court observed that it "disagree[d] with Plaintiffs on the underlying question of Launderville's liability," affirmed the District Court's conclusion that "Launderville is liable for contribution as a co-fiduciary," remanded for the District Court to assess "the extent of Launderville's liability to Laumeister" and held that "Plaintiffs are entitled to seek full satisfaction of the judgment from Laumeister, subject to Laumeister's right to seek contribution from Launderville[.]" *Id.* at 199–200. This Court concluded Launderville engaged in "classic self-dealing," and should not "escape liability entirely" and held that although Launderville's and Browe's breach of fiduciary duty claims were time-barred under ERISA's three-year statute of limitations codified in 29 U.S.C. § 1113(2), because Cross-Appellants failed to prove that all Appellants had knowledge of the breaches more than three years prior to the commencement of this suit, the District Court correctly rejected Cross-Appellants invocation of ERISA's three-year statute of limitations as to

20

claims for breach of fiduciary duty made on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3). *Id.* at 191.

This Court also determined the Plan was never terminated and, therefore, earnings on the Plan's account balance that accrued since 2004 must be calculated in order to determine the earnings payable to participants having a viable claim (rather than being payable to CTC as would have been the case if the Plan had terminated under 29 U.S.C. §1344 (c)).[2] *Id.* at 197–98.

On remand, the District Court held evidentiary hearings on June 3, 2022, August 31, 2022, and October 14, 2022, and issued: (1) the Remedial Order; (2) the Post Remedial Order; (3) the Entry Order; and (4) the Final Judgment. A25–A32.

The District Court's Remedial Order made numerous findings, including: (1) as of August 29, 2022, the Plan's total losses, inclusive of lost earnings, are $807,155; (2) Launderville and Browe's claims for benefits are barred by the applicable six-year Vermont statute of limitations for breach of contract; (3) the Burgess heirs' claims are not barred by the statute of limitations because Launderville, as Plan Administrator, lied to them about the unavailability of benefits, they were not notified in writing that their claim was denied, and the Court would not penalize them for believing Launderville; (4) the statute of limitations did not

---

[2] 29 U.S.C. §1344 (c) provides in pertinent part that "any increase or decrease in the value of the assets of a single-employer plan occurring after the date on which the plan is terminated shall be credited to, or suffered by, the corporation."

bar other Plan participants from recovering benefits because there was no clear repudiation of their request for Plan benefits and they were not notified in writing of a denial of any request for a continuation of Plan benefits; (5) all Plan participants are eligible to be paid the value of their Plan accounts, including Launderville and Browe; (6) Launderville's liability to Laumeister for contribution equals 50% of the judgment amount; (7) Cross-Appellants must pay the portion of the judgment amount owed to all other Plan participants first and may then set off the amount due and owing to Launderville by the amount of her contribution obligation to Cross-Appellants. SA27–SA28.

The District Court's Entry Order set a final judgment amount of $829,915.00 (the "Restoration Award"), for payment to all Plan participants, and a contribution judgment against Launderville for $414,957.50. *See* SA41. The Court denied all of the arguments raised by the parties on reconsideration and deferred on deciding all parties' motions for attorney fees and costs until after this appeal. SA38–SA39. The District Court noted that "Launderville and Browe may not recover attorney's fees and costs for claims on which they did not prevail and may have an obligation to pay Defendants' attorney's fees on those issues. In addition, beyond the court's remedial order, they have no enforcement mechanism against Defendants." SA33. As of the filing of this appeal, the Estate has made payments in full to fourteen of the sixteen Plan participants totaling $545,940.00. *See* A372. Launderville and Browe have

22

not been paid because their claims are barred by the six year statute of limitations on claims for benefits, a central issue of this cross-appeal.

## SUMMARY OF THE ARGUMENT

The District Court correctly determined on remand that Browe and Launderville's claims are time-barred under the applicable Vermont statute of limitations for a breach of contract action because they had actual knowledge that CTC would not and could not pay their Plan benefits as of February of 2008, which was more than six years prior to their filing suit in December of 2015. A320–A321; *Browe*, 15 F.4th at 192. At that time, both Browe and Launderville sought to take advantage of their insider status to secure a side deal with Laumeister that was unavailable to other Plan participants. SA9. Because they knew CTC's cash flow was insufficient to fund payments under the Plan, they approached Laumeister directly with the understanding that rather than file suit, they could extract their Plan benefits from him based upon his personal promise to put them in his will. SA9. The District Court correctly determined that any reasonable person in Browe and Launderville's situation would have been aware of a cause of action, regardless of whether they knew the precise legal claim to be advanced. SA18.

Like this Court did in 2021, the District Court further made the correct determination that Launderville, as a co-fiduciary to the Plan, engaged in classic self-dealing by seeking to enter into a "side deal" with Laumeister in regards to Plan benefits, and lying to Beverly Burgess' heirs when they approached her about Plan benefits in 2004. SA20. Launderville advised them no Plan benefits were available

24

when she knew Plan benefits were being paid to at least four Plan participants. SA22. Because of this finding of self-dealing and because Launderville affirmatively violated her fiduciary obligations as a plan administrator by not protesting the misuse of Plan assets, the District Court correctly found—as this Court did in 2021—Launderville liable to CTC and Laumeister for contribution. SA24. After payment of the Restoration Award to all other Plan Participants, the District Court also correctly found that CTC and Laumeister are entitled to offset the amount due and owing to Launderville by the amount of her contribution obligation. SA26–SA27.

Despite correctly finding that both Launderville and Browe's claim for wrongful denial of benefits under the Plan are time-barred, and that Launderville engaged in self-dealing and breached her fiduciary duty to the Plan and its participants, the District Court improperly awarded Browe and Launderville the value of their Plan accounts along with all other Plan participants, subject to Launderville's liability for contribution and CTC and Laumeister's right of set-off. The District Court ignored this Court's prior finding that the Plan was never terminated. Instead, the District Court incorrectly reasoned that because Launderville and Browe's benefits were vested and non-forfeitable, they were entitled to payment notwithstanding expiration of the applicable statute of limitations period because the Plan was somehow erroneously "terminated" in a

manner not complying with ERISA.  Therefore, the District Court held that payment of Launderville and Browe's benefits is not dependent upon the resolution of any wrongful denial of benefits claim.

In making this finding, the District Court misconstrued the meaning of "nonforfeitability" under 29 U.S.C. § 1002(19) and (citing the Appellants' brief) improperly relied upon 29 U.S.C. § 1344.  SA19.  In its Remedial Order, the District Court stated that "while Plaintiffs Browe and Launderville may be precluded from bringing a legal claim for recovery of benefits, they are otherwise similarly situation to all other Plan Participants and should be treated the same."  SA19.  This finding was based, in part, upon the finding that Browe and Launderville's benefits are vested and "nonforfeitable" and therefore payment of those benefits is guaranteed notwithstanding the running of the applicable statute of limitations period.  SA33.

As set forth below, it is well settled under Supreme Court precedent that "nonforfeitable" does not mean benefits under a plan are guaranteed.  *See Alessi v. Raybestos-Manhattan, Inc*. 451 U.S. 504, 512 (1981) (explaining "nonforfeitable" means "an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or method for calculating the benefit"); *see also Nachman Corp. v. Pension Benefit Guar. Corp*., 446 U.S. 359, 371 (reading "unconditional" in § 1002(19) to mean that "any and all conditions precedent to the participant's asserting a claim to his benefits have been met  . . . [not] that a

26

participant is entitled to a fixed amount of benefits regardless of any and all later-occurring conditions"). Even though Browe and Launderville's benefits were nonforfeitable, that does not mean their claims may not be barred by expiration of the statute of limitations period. As stated in *Modzelewski v. Resolution Trust Corp.*, "nonforfeitable does not mean that the **payments** must be absolutely unconditional." 14 F.3d 1374, 1378 (9th Cir. 1994) (emphasis added).

In rendering its decision on Browe and Launderville's Plan benefits, the District Court overlooked that 29 U.S.C. § 1344 is a statute that is conditioned upon Plan termination, which this Court found did not occur. 29 U.S.C. § 1344 provides, in pertinent part:

> (a) Order of priority of participants and beneficiaries. ***In the case of the termination of a single-employer plan***, the plan administrator shall allocate the assets of the plan [. . . ] among the participants and beneficiaries of the plan [. . . ] (emphasis added).

As this Court correctly found, *the Plan was never terminated*. It follows that the mandatory allocation provision of 29 U.S.C. § 1344 is inapplicable to the distribution of benefits here. This Court further noted, "a termination that complies with neither the requirements of ERISA nor the terms of the operative plan itself is no termination at all." *Browe*, 15 F.4th at 197. This Court cited 29 U.S.C. § 1344 for the conditional proposition that, ***if the Plan had been terminated***, then the vested benefits would have been required to be distributed in 2004 in accordance with that

provision of the United States Code. *Id.* at 197–98. Since the Plan had ***not*** been terminated, and the benefits were not distributed, earnings on the Plan balance continued to accrue. *Id.* at 198–99.

For that very reason, the Second Circuit ordered the District Court to recalculate the Restoration Award by including earnings on the Plan's projected balance from 2004 through the date of the District Court's judgment. *Id.* at 199.

By ordering payment to Launderville and Browe of benefits under the Plan, the District Court not only rendered its statute of limitations determination meaningless, but also directly contradicted this Court's prior ruling that the Plan had not been terminated, and thus earnings continued to accrue on participants' benefit amounts through the date of judgment. This Court expressly stated Browe and Launderville did not establish their entitlement to benefits as a matter of law "as Defendants may have viable defenses to those claims." *Id.* at 202. As set forth below, Cross-Appellants have a viable statute of limitations defense to those claims, and this Court's prior rulings largely dictate resolution of the remaining issues on appeal.

We note that even if the Plan had been terminated, and 29 U.S.C. 1344 were applicable to the Plan, the District Court's notion that the statute of limitations defense therefore does not exist is contrary to established precedent and the legislative intent behind 29 U.S.C. § 1344. As stated in *Clancy v. United Healthcare*

*Ins. Co.*, "[t]he statute of limitations' timeframe exists regardless of whether the plan remains in place at the time that a plaintiff brings suit." 643 F. Supp. 3d 589, 601 (E.D. Va. 2022). Moreover, as the Supreme Court stated in *Mead Corp. v. Tilley*, ERISA Section 4044 (codified in 29 U.S.C. § 1344) serves merely as a distribution mechanism and there is nothing in the legislative history suggesting Congress intended 29 U.S.C. § 1344 to be a source of benefit entitlements rather than an allocation scheme. *Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989).

29

## ARGUMENT ON CROSS-APPEAL

CTC and Laumeister assert the following legal arguments in support of their Cross-Appeal:

### I. Browe And Launderville Cannot Recover Benefits Under the Plan Like Other Plan Participants Because Their Recovery Is Barred By The Statute of Limitations.

#### A. *Launderville and Browe are not Plan "Participants" and should not have been considered as such in the District Court's Remedial Scheme.*

In 2021, this Court ordered and directed the District Court to: "craft a remedial scheme that takes into account the vested rights of ***participants*** after conducting, to the extent necessary, any additional fact-finding." *Browe*, 15 F.4th at 206 (emphasis added). Browe and Launderville are <u>not</u> participants and therefore not entitled to recover benefits. The District Court's award of benefits to Browe and Launderville should be reversed.

Browe and Launderville predicate standing to bring their action on 29 U.S.C. 1002(7) (A38–A40), which specifically defines the term "participant" as:

> [A]ny employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, or whose beneficiaries may be eligible to receive any such benefit.

29 U.S.C. § 1002(7).

For *former* employees like Launderville and Browe, the United States Supreme Court adds that: "a claimant must have a colorable claim that he will prevail in a suit for benefits . . . ." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 118 (1989); *L.I. Head Start Child Dev. Servs., Inc. v. Econ. Opportunity Comm'n of Nassau Cnty., Inc.*, 710 F.3d 57, 65 (2d Cir. 2013) ("For a claimant to establish that he or she 'may become eligible' for benefits, the claimant 'must have a colorable claim that [ ] he or she will prevail in a suit for benefits.'").

Based on the District Court's finding that Browe and Launderville's claims for benefits under 29 U.S.C. § 1132(a)(1)(B) are time-barred (SA2), as a matter of law, Browe and Launderville do not have, and did not have as of the date of the Complaint filed in this action, "colorable" claims. Therefore, they are not "participants" as that term is defined in 1002(7) and do not have a right to participate in any remedial scheme. The District Court erred by considering and including them in its recrafted remedial scheme. *Chuck v. Hewlett Packard Co.*, 455 F.3d 1026, 1039 (9th Cir. 2006).

As the Ninth Circuit found in *Chuck*:

> Chuck's claim for benefits was clearly time-barred when he filed this suit, in light of Chuck's own actions and understandings. In agreeing with the district court's decision on summary judgment that Chuck's benefits claim is time-barred, we have necessarily concluded that no reasonable trier of fact could have decided that issue in Chuck's favor. *See, e.g., El–Hakem v. BJY Inc.,* 415 F.3d 1068, 1072 (9th Cir. 2005). Accordingly, it is certain that

31

> Chuck's claim is time-barred, and a claim that is clearly
> time-barred because of the claimant's own actions is not
> 'colorable' for the purposes of establishing ERISA
> standing. *See Adamson v. Armco, Inc.,* 44 F.3d 650, 654
> (8th Cir. 1995). At the time he initiated this lawsuit, Chuck
> therefore was not a plan "participant" under § 1002(7), and
> thus he lacks standing to bring his claims against the Plan
> under § 1132(a)(1)(A).

*Chuck*, 455 F.3d at 1039.

Although the holding in *Chuck* relates to claims under 29 U.S.C. 1132(a)(1)(A) (relating to a plan fiduciary's failure to provide plan information to participants), it applies equally to claims brought under 29 U.S.C. 1132(a)(1)(B) for benefits because under 29 U.S.C. 1132(a)(1), claims may be brought by "a participant or beneficiary." Browe and Launderville were not participants (or beneficiaries) at the time they commenced this action as their claims were time-barred. A320–A321; *Browe*, 15 F.4th at 192. Accordingly, they lacked standing to bring a claim under 29 U.S.C. 1132(a)(1)(B) and the District Court erred in considering them participants when crafting a remedial scheme based on this Court's mandate.

### B.     *The District Court's Remedial Scheme is unreasonable because it renders the statute of limitations defense meaningless.*

Even if Browe and Launderville were eligible "participants" under ERISA, which they are not, the District Court's ruling allowing Browe and Launderville to recover benefits despite finding that Browe and Launderville's claims are time-

barred impermissibly end-runs the statute of limitations and should be reversed. *Carey v. Int'l Bhd. of Elec. Workers Loc. 363 Pension Plan*, 201 F.3d 44, 48–49 (2d Cir. 1999).

In *Carey*, this Court addressed this issue and explained:

> Next, we find no merit in Carey's argument that § 1132(a)(1)(B) creates separate causes of action for (1) a declaratory judgment with respect to future benefits, and (2) entitlement to present benefits—with correspondingly different accrual dates. First, contrary to the conclusion of at least one court, *see Belnomi v. Sonoco Prods. Co.,* 686 F.Supp. 520, 521 (E.D.Pa.1988), nothing in § 1132(a)(1)(B) supports such an interpretation. ***Second, such an interpretation effectively would render the limitation period meaningless: Merely by delaying his formal application for benefits—for strategic reasons or otherwise—a plaintiff could sue long after he initially pursued his claims with the plan.*** *See Daill,* 100 F.3d at 67. Because, "whenever possible, statutes should be interpreted to avoid unreasonable results," *Dougherty v. Carver Fed. Sav. Bank,* 112 F.3d 613, 624 (2d Cir.1997) (citing *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982)), ***we decline to construe § 1132(a)(1)(B) in a way that would render the limitation period a limit in name only.***

201 F.3d at 48–49 (emphasis added).

Notwithstanding the complexity of the ERISA principles at issue, allowing two parties whose benefit claims are time-barred to recover nonetheless, exalts form over substance, contorts the remedial purposes of ERISA, and renders the statute of limitations meaningless. Accordingly, the District Court's ruling allowing Browe and Launderville to recover benefits should be reversed.

33

**II.** **As This Court Correctly Found, The Plan Was Never Terminated, So 29 U.S.C. § 1344 Does Not Apply To This Case And The District Court Erred In Applying 29 U.S.C. § 1344 And In Treating Its Allocation Scheme As Tolling The Statute Of Limitations.**

The District Court entirely disregarded this Court's prior finding that the Plan was never terminated. *Browe*, 15 F.4th at 197. Instead, the District Court made the erroneous and unsupported findings that that the Plan had somehow terminated, 29 U.S.C. § 1344 applies, and thus Browe and Launderville should receive an automatic distribution of vested, nonforfeitable benefits. 29 U.S.C. § 1344 is a mechanical allocation provision under ERISA that requires the allocation of vested, nonforfeitable benefits when a plan has terminated. *Mead Corp.*, 490 U.S. at 717. That allocation provision of 29 U.S.C. § 1344 does not apply to payments under the Plan because the Plan was *never* terminated, as this Court has made clear.

Tellingly, Appellants do not address 29 U.S.C. § 1344 in their briefing, despite the District Court's reliance on the statute when erroneously awarding Browe and Launderville their benefits. Whether this was a purposeful or inadvertent omission is not clear, but perhaps indicates that Appellants would prefer to ignore this provision because it ultimately undermines their position on this issue.

A.     *As this Court found, the Plan was never terminated.*

The District Court's ruling pulls out of thin air the flawed and inconsistent premise that there was an "improper," informal termination of the Plan and, at the same time, there was a "court ordered" and "erroneous" termination of the Plan. SA18–SA19.  Nowhere does the District Court's ruling state any particular date of termination of the Plan, nor which proceeding resulted in a "court ordered termination of the plan."  SA18–SA19.  The District Court's ruling is directly contrary to this Court's earlier ruling that:

> "[A] termination that complies with neither the requirements of ERISA nor the terms of the operative plan itself *is no termination at all*. At a bare minimum, Laumeister could not terminate the Plan without first amending it to provide a date for its termination and, under the terms of the Plan (and ERISA), providing notice of that amendment to all participants. *See Frommert v. Conkright*, 433 F.3d 254, 263 (2d Cir. 2006) ("[A]n ERISA 'amendment' to a plan occurs only when the plan's employees are informed of a change in the text of the plan.").

*Browe*, 15 F.4th at 197.

As this Court determined, Plan participants were not notified of the Plan's termination, a formal amendment of the Plan did not occur and Laumeister could not have *informally* amended the Plan to terminate it.  *Id.* (citing *Frommert v. Conkright*, 433 F.3d 254, 262–63 (2d Cir. 2006) (holding an amendment to a plan only takes

35

place once the employees are properly informed of the change to the plan)); *see also In re Citigroup Pension Plan ERISA Litig.*, No. 05 CIV. 5296 (SAS), 2007 WL 4205855 (S.D.N.Y. Nov. 20, 2007) (holding amendments to an ERISA plan become effective at the moment when employees are properly informed of the amendment); *Hirt v. Equitable Ret. Plan*, 441 F. Supp. 2d 516 (S.D.N.Y. 2006) (finding an amendment was not binding on plan participants on the basis of a one-page ambiguous memorandum); *Tatum v. R.J Reynolds Tobacco Co.*, No. 1:02CV00373, 2011 WL 2160893 (M.D.N.C. June 1, 2011) (holding plans may not be informally amended and amendments must be in writing).

Other courts within the Second Circuit have echoed the principle articulated in *Tatum* that any amendment to an ERISA plan must not only be in writing, but also conform to whatever procedures for plan amendments are laid out in the Plan document. *See Ehrlich v. NYNEX Corp.*, 949 F. Supp. 213, 219 (S.D.N.Y. 1996) (rejecting use of a newsletter as an effective amendment to the plan based on the principle that an ERISA plan "may not be amended orally or through informal written means"); *see also Normann v. Amphenol Corp.*, 956 F. Supp. 158, 162 (N.D.N.Y. 1997) (noting, "[u]nder ERISA, a change in the terms of a benefit plan is only valid if made in writing pursuant to the amendment procedure and by the amending authority set forth in the benefit plan").

Nor did either this Court or the District Court terminate the Plan by court order. The requisite trigger for allocations under 29 U.S.C. § 1344 is termination. Here, the Plan never terminated, so the District Court erred in relying on the allocation provisions under 29 U.S.C. § 1344 in crafting the remedial scheme. Moreover, because 29 U.S.C. § 1344 does not apply under the circumstances here, the District Court further erred in determining that any benefits should be paid to Launderville or Browe on the basis of that statute.

### B.     *Termination of a plan does not extinguish the existence or application of a statute of limitations defense.*

Even if the Plan had been terminated—which it had not been—and 29 U.S.C. § 1344 applied, the statute of limitations defense exists and applies as well. The court in *Clancy v. United Healthcare* articulated this principle when addressing a different set of circumstances, but the concept remains applicable here. 643 F. Supp. at 601. *Clancy* involved a liquidating trustee that brought an action against insurers operating as claims administrators, alleging breaches of fiduciary duties arising under ERISA. The defendant insurers argued they could not be held liable because the plan had been terminated. The *Clancy* court disagreed, relying on the well-settled tenet under ERISA that the "statute of limitations' timeframe exists regardless of whether the plan remains in place at the time that a plaintiff brings suit." *Clancy*, 643 F. Supp. at 601. Here, the District Court's notion that the statute

37

of limitations defense does not exist is contrary to established precedent and the legislative intent behind 29 U.S.C. § 1344.

**C.**   ***Section 1344 is a mechanical allocation scheme and does not establish any entitlement to new benefits.***

Perhaps even more significant is that the intent of 29 U.S.C. § 1344 is not to establish a new entitlement to benefits, but rather, to merely serve as a mechanical allocation scheme. *Mead*, 490 U.S. at 723. In *Mead*, the United States Supreme Court addressed whether, upon termination of a defined benefit plan, 29 U.S.C. § 1344(a) requires a plan administrator to pay plan participants unreduced early retirement benefits provided under the plan before residual assets may revert to an employer. *Id.* at 716. The Supreme Court held that § 1344 "does <u>not</u> create benefit entitlements but simply provides for the orderly distribution of plan assets required by the terms of a defined benefit plan or other provisions of ERISA." *Id.* at 725. By ignoring the statute of limitations bar that otherwise applied, the District Court created a new entitlement to benefits for Launderville and Browe, in direct contravention of the intent of ERISA and Supreme Court precedent.

Noteworthy is that the court in *Lewis v. PBGC* explained 29 U.S.C. § 1344(c) mandates that a post-termination increase or decrease in plan assets must be credited

to the corporation, not plan participants.[3]  *Lewis v. Pension Benefit Guar. Corp.*, 912 F.3d 605, 607 (D.C. Cir. 2018).  In *Lewis*, The Court of Appeals for the District of Columbia Circuit reversed a district court decision allowing participants in a pension plan to seek recovery of an increase in the value of plan assets that took place after the plan had been terminated.  *Id.*  In reversing the district court, the court explained:

> . . . any post-termination change in the value of plan assets must be "credited to, or suffered by" the Corporation in its capacity as guarantor. 29 U.S.C. § 1344(c). This makes sense: Each participant's benefits are calculated at the time of plan termination and shielded from additional loss by the Corporation. If plan assets increase in value, the Corporation is likewise credited with that gain. The Corporation assumes this responsibility as guarantor of certain plan benefits.

*Id.* at 612.

This is why this Court determined in 2021 that Plan earnings are payable to the participants and not to CTC—the Plan was not terminated.  The District Court's determination that the Plan had terminated and its application of Section 1344 to award time-barred benefits is simply wrong.  For all of these reasons, the District Court's erroneous application of § 1344 should be reversed and benefits to Browe and Launderville should be denied.

---

[3] Also worth noting is that *Lewis* points out that § 1344(c) does not apply to ongoing plans, only terminated plans.  "Ongoing plans are not subject to the same statutory instructions as terminated plans when it comes to '[a]ny increase or decrease in the value of the assets.'"  *Lewis*, 912 F.3d at 611 (citing 29 U.S.C. § 1344(c)).

**III.** **Launderville Should Not Be Allowed To Recover Benefits Because She Engaged In Self-Dealing And Breached Her Fiduciary Duty To The Plan As A Representative Of The Plan Sponsor And As Plan Administrator And Co-Fiduciary.**

The District Court incorrectly allowed Launderville to recover benefits, despite finding that she engaged in self-dealing and breached her fiduciary duty to the Plan, which is precluded under ERISA. Section 406(b) of ERISA prohibits a fiduciary from dealing with plan assets in the fiduciary's own interest or for the fiduciary's own account. Under §406(b)(1), a fiduciary may not:

> (1) Deal with plan assets in her own interest;
>
> (2) Act in a transaction involving a plan on behalf of a person whose interests are adverse to the interests of the plan, its participants, or beneficiaries; or
>
> (3) Receive any consideration for her own personal account from any party dealing with the plan in connection with a transaction involving the plan's assets.

**A.** *As this Court highlighted in 2021, Launderville engaged in classic self-dealing in violation of ERISA.*

The District Court relied on ample evidence in finding that Launderville's actions at the time Plan assets were used to pay company operating expenses were acts of self-dealing. At that time, Launderville collected a handsome salary from CTC. A218. As the President, COO, and a director of CTC, Launderville was also in the unique position of being well aware of the need to make company payroll, and

40

the direct impact on her personal finances by failing to do so.  A215, A218.  By transferring Plan assets, she ensured payment of her own salary.

Launderville's self-dealing in the misuse of plan assets is also evident from her failure to inform any (other) Plan participants that the Plan was terminated, or that Plan assets were being used to fund CTC's operations.  *Browe*, 15 F.4th at 201; SA9.  In 2004, when approached by Beverly Burgess' heirs, Launderville lied to them and stated that there were no benefits available under the Plan.  She did so knowing that other Plan participants were receiving benefits at this time.  SA7.  She was not only dishonest, but also favored some Plan beneficiaries over others for no apparent reason other than personal preference.  SA22.  It was not until Launderville determined that Laumeister had reneged on his personal promise to pay her Plan benefits that she contacted other Plan participants to file a lawsuit on December 28, 2015.  SA9.

## B.  *Launderville ignored her affirmative duty to notify Plan participants regarding the misuse of Plan funds, among other duties.*

As a fiduciary, Launderville had an obligation to be truthful to all participants in the Plan when providing information about their benefits and an affirmative obligation to notify Plan participants of the diversion of Plan assets to fund CTC's operations, and to take action to stop such misuse.  The affirmative duty to notify Plan participants is demonstrated by *In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 772 F. Supp. 2d 519 (S.D.N.Y. 2011).  Prudential Retirement

41

Insurance and Annuity Company ("Prudential") claimed that State Street Bank and Trust Company ("State Street") breached its fiduciary duty to over 200 plans by recommending highly leveraged subprime mortgage-backed securities without disclosing their risks. *Id*. However, during the years leading up to the Great Recession in 2008, State Street informed Prudential that the bond funds were underperforming, but Prudential did not communicate this information to the plans. *Id*. at 545, 553. The *State Street* court recognized that "an ERISA fiduciary faces an ***affirmative duty to inform when the fiduciary knows that silence might be harmful.***" *Id*. at 553 (emphasis added).

Had Launderville notified Plan participants, rather than blatantly and intentionally disregarding her affirmative fiduciary duty, the participants may have been able to pursue an injunction to stop the diversion. At a minimum, they would have had the opportunity to take into account in their personal financial planning that those benefits would not be available. The Plan participants unquestionably suffered direct harm as a result of Launderville's breach of her fiduciary duty to the Plan.

**C.** ***Launderville impermissibly received a kickback by entering into a side deal with Laumeister, in violation of ERISA.***

Section 406(b)(3) of ERISA—commonly called the "anti-kickback" provision—prohibits a fiduciary from receiving "any consideration for his own personal account from any party dealing with such plan in connection with a

transaction involving the assets of the plan." Launderville accepted a "kickback" when she entered into a "side deal" with Laumeister, agreeing to be a beneficiary of Laumeister's will while knowing that Laumeister was a fiduciary to the Plan and had obligations to other Plan participants. SA9; *Browe*, 15 F.4th at 201.

**D.** ***Launderville is also liable as a Plan co-fiduciary pursuant to ERISA.***

Launderville is also liable as a co-fiduciary for actions taken by Laumeister with respect to the Plan. Under Section 405(a) of ERISA, claims may be asserted against a fiduciary arising from a breach by another fiduciary, even where the first fiduciary did not participate in the transaction, if <u>one</u> of the following three circumstances applies:

> (i)The first fiduciary ***knowingly participated*** in or knowingly undertook to ***conceal a breach*** by a second fiduciary;
>
> (ii)By the first fiduciary's failure to discharge his own duties, the first fiduciary ***enabled the second fiduciary to commit a breach***; or
>
> (iii)The first fiduciary had knowledge of a breach of duty by the second fiduciary and ***failed to make reasonable efforts*** to remedy the breach.

In Launderville's case, <u>all three</u> prongs of ERISA § 405(a) have been met. Launderville knowingly participated in the use of Plan assets to fund CTC's operations. SA9. She enabled the breach by her silence and completed the administrative actions necessary to make the bank transfers. *Browe*, 15 F.4th at 201. She failed to make reasonable efforts to remedy the breach—in fact, she made no

such effort at all, except to seek recovery for her own account. SA9. Noteworthy is that she resigned shortly after the Plan account was exhausted, and did nothing thereafter to remedy the diversion of Plan assets. SA20; *Browe*, 15 F.4th at 201.

### E. *Launderville does not have a colorable claim to benefits under the Plan because the damages resulting from her fiduciary breaches exceed her purported account balance in the Plan.*

ERISA precedent confirms that Launderville does not have a colorable claim to recover benefits as a result of her fiduciary breaches. In *Parker v. Bain*, 68 F.3d 1131 (9th Cir. 1995), Steven Parker, the Vice President and owner of Pacific Ship Repair and Fabrication, Inc. and David Bain, the President, CEO, and board chairman, conspired to embezzle funds from Pacific Ship Repair and Fabrication Profit Sharing Savings Plan (the "Pacific Plan"), the company's ERISA-governed pension plan. Following federal prosecution for his crimes, Parker brought a civil action against the Pacific Plan claiming he was owed benefits. *Id.* at 1134.

The Ninth Circuit disagreed with Parker, reaffirmed the district court's ruling that Parker had breached his fiduciary duty to the Plan and found that because the damages suffered by the Plan exceeded Parker's account balance in the Pacific Plan, any interest Parker would have had in the Pacific Plan absent his fiduciary breach was extinguished. *Id.* at 1135. Because Parker no longer had an interest in the plan, he could not have a colorable claim to benefits and therefore lacked standing to bring a claim for breach of fiduciary duty. *Id.*

Based upon the cases and statutory provisions regarding fiduciary liability under ERISA, Launderville, as a breaching fiduciary, should be denied *any* recovery as a participant in CTC's Plan.  To permit a fiduciary to recover losses she incurred that were the direct result of her own self-dealing and other fiduciary breaches would be contrary to the policy and intent of ERISA and established case law on the topic. The District Court thus erred in awarding benefits to Launderville and its incorrect ruling on that issue warrants reversal.

## OPPOSITION TO ARGUMENTS ON APPEAL

CTC and Laumeister assert the following legal arguments in opposition to Appellants' arguments on appeal:

## I. The District Court's Order Offsetting Launderville's Plan Benefits Does Not Violate ERISA.

### A. *Both case law and the principles of equity under ERISA require that any amount found to be owed to Launderville by the Plan be offset against the amount she owes the Plan for breaching her fiduciary duties.*

Appellants mistakenly argue on appeal that the District Court's Order offsetting Launderville's Plan Benefits violates ERISA. To the contrary, ERISA supports the offset of Launderville's Plan benefits. The principles of ERISA § 502(a)(3) are demonstrated by *Youngberg v. The Bekins Co.*, 930 F. Supp. 1396 (E.D. Cal. 1996), which permits a plan fiduciary to bring a claim for indemnification under ERISA against a co-fiduciary based on the co-fiduciary's alleged violation of plan terms. As the Court found in *Youngberg*, such indemnification is allowed even if the fiduciary seeking indemnification does not bring an action against the co-fiduciary **on behalf of the Plan**, and supports the District Court's Order below offsetting Launderville's Plan benefits.

In *Youngberg*, CNA Insurance Companies ("CNA") miscalculated benefits owed to a participant in the subject plan. The Bekins Co. ("Bekins") cross-claimed for indemnification against CNA, asserting the plan was administered by Bekins

through an insurance contract purchased from CNA, and CNA was responsible for the calculation of benefits under the plan. CNA argued that ERISA does not provide for indemnification between co-fiduciaries. Bekins sought indemnity under 29 U.S.C. § 1132(a)(3) in the event Bekins was held liable for payment of benefits to plaintiff. *Id.* at 1400.

The *Youngberg* court found that ERISA §502(a)(3) expressly provides a fiduciary with an ***equitable remedy*** for redressing violations of the plan or to enforce the plan. The court held that, at common law, indemnity was considered a traditional equitable remedy. *Youngberg*, 930 F. Supp. at 1401. Given that the statute's purpose is to ensure that beneficiaries receive the benefits they are entitled to under an employee benefit plan, actions in equity further that statutory purpose because they hold liable those whose conduct caused the deprivation of benefits.

The ruling in *Youngberg* is confirmed by *Lehr v. Perri*, No. 2:17-CV-1188 WBS AC, 2019 WL 1556672 (E.D. Cal. Apr. 10, 2019). Plaintiffs Paul and Colleen Lehr ("Lehr") brought ERISA claims against Perri Electric, Inc. ("Perri Electric"), its owner, Frank Perri, and the Perri Electric Inc. Profit Sharing Plan and Trust (the "Perri Plan"). Lehr worked for Perri Electric for approximately three decades until the company discovered that she embezzled over one million dollars from Perri Electric and the Perri Plan. Following Lehr's conviction, she brought several ERISA-based claims against Perri Electric.

47

In dismissing Lehr's claims, the *Lehr* court found that she acted as a de facto fiduciary when she misappropriated funds from the Perri Plan and that such misappropriation constitutes a breach of her fiduciary duty to act solely in the interest of the plan and its participants. *Id.* at 13.  In addition, the court found that, consistent with ERISA, the court could *set off* the money Lehr owed to the Perri Plan against the money owed to her by the Perri Plan, even though the defendants did not plead that as an affirmative defense.  Because the money she owed to the Perri Plan exceeded any money it may have owed her, she could not bring a claim as a participant against the defendants for breach of their fiduciary duty. *Id.* at 14.

Like the plaintiffs in *Parker* and *Lehr,* Launderville mishandled funds within the Plan when she transferred them from the Plan account to CTC's operating account.  She breached her fiduciary duty in doing so because she did not act solely in the best interests of the Plan and its participants.  Because the damages suffered by the Plan exceed Launderville's interest in the Plan, she no longer has standing as a participant to bring a claim against Laumeister or CTC for breach of fiduciary duty. The principles of *Parker* and *Lehr* and the principles of equity under ERISA require that any amount found to be owed to Launderville by the Plan (which is naught because she is not a participant) be set off against the amount she owes the Plan for breach of her fiduciary duty, even though no claims were brought against her on behalf of the Plan.

48

**B.** *An exception to ERISA's anti-alienation provision applies to allow for offset of Launderville's benefits and such offset furthers ERISA's equitable purpose of deterring fiduciary breaches.*

ERISA Section 206(d)(1) provides that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." 29 U.S.C. § 1056(d). As Appellants correctly point out, the subject Plan contains such a provision. A192. An exception to this "anti-alienation" provision exists, which states the anti-alienation provision does not apply to any offset of a participant's benefits against an amount the participant is ordered or required to pay to the plan under a civil judgment entered by a court in connection with a violation of ERISA even if the judgment expressly provides for the offset. *See* 29 U.S.C. § 1056(d)(4).

Appellants argue that the exception of 29 U.S.C. § 1056(d)(4) does not apply here because Launderville has been ordered to pay an amount in contribution to Laumeister, rather than directly to the Plan. Appellants are incorrect. The exception does apply here because Launderville's liability in contribution is in effect an amount she is required to pay to the Plan. Her liability for 50% of the Restoration Award is not a requirement for her to pay an amount to Laumeister personally. It is in fact payment in contribution to the Plan through Laumeister as a fiduciary to the plan.

Appellants are also mistaken in arguing that offset would allow Laumeister and CTC to keep a portion of the funds they owe to the Plan instead of repaying the

49

Plan's losses in full, in violation of ERISA 403(c)(1), 406(b) and 409(a). That argument is meritless because the Plan has not suffered any loss to the extent of Launderville's benefits. The amount Launderville owes to the Plan *exceeds* the amount owed to her by the Plan.

Finding in favor of Appellants with respect to offset would thwart the equitable purposes of contribution under ERISA. *In re Masters & Pilots Pension Plan*, 957 F.2d 1020, 1032 (2d Cir. 1992). As this Court recognized in *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* "[w]e think that even a breaching fiduciary should be entitled to the protection of contribution . . . . Full responsibility should not depend on the fortuity of which fiduciary a plaintiff elects to sue." 939 F.2d 12, 16 (2d Cir. 1991); *see also Glus v. G.C. Murphy Co.*, 629 F.2d 248 (3d Cir. 1980) ("It is now widely recognized that fundamental fairness demands a sharing of the liability."). Disallowing the offset of Launderville's benefits would be counter to the purpose of ERISA to deter the very type of fiduciary breaches that Launderville engaged in. As this Court stated in *Masters*, "*Chemung* reflects our belief that ERISA's purpose of deterring pension plan abuse is frustrated when solvent breaching fiduciaries are allowed to escape the consequences of their actions." *Masters*, 957 F.2d at 1029.

50

## II. The 50/50 Allocation Of Liability Between Laumeister And Launderville Follows Applicable Trust Law.

Appellants are incorrect that CTC should have been included in the District Court's allocation of liability in this matter for several reasons. As a threshold matter of procedure, the District Court did not explicitly make a determination as to CTC's liability despite this Court's mandate in 2021 to do so on remand. *Browe*, 15 F.4th at 199. As a result, this issue may not be ripe on appeal. *AMSAT Cable Ltd. v. Cablevision of Conn.*, 6 F.3d 867, 872 (2d Cir. 1993). However, any further inquiry on CTC's liability is not necessary as the District Court made the ultimate decision not to allocate any share of liability for contribution purposes to CTC, despite finding CTC jointly and severally liable with Laumeister for breaching fiduciary duties. Moreover, contrary to Appellants' representation, and most likely the basis for the District Court's decision, CTC has no assets from which any potential allocation could be drawn and CTC did not authorize the use of plan funds for business operations. Tellingly, Browe and Launderville were aware they had claims against CTC in 2008, but sought benefits from Laumeister directly instead of seeking anything from CTC because they knew CTC could not pay their claims. SA9; A215. For these reasons, CTC should not be included in the District Court's allocation of liability; the 50/50 allocation of liability between Laumeister and Launderville should be affirmed.

**A.** *If such an inquiry is deemed necessary, a determination as to the allocation of any liability to CTC is not ripe on appeal.*

To be justiciable, a cause of action must be ripe—it must present "a real, substantial controversy, not a mere hypothetical question." *AMSAT Cable Ltd.,* 6 F.3d at 872. Ripeness "is peculiarly a question of timing." *Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 687 (2d Cir. 2013) (citing *Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580, (1985)). "In its leading case on ripeness, the Supreme Court held that determining whether a dispute is ripe for review requires a two-pronged analysis of (1) whether the issues presented to the district court are fit for review, and (2) what hardship the parties will suffer in the absence of review. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders,* 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)." *Connecticut v. Duncan*, 612 F.3d 107, 113 (2d Cir. 2010).

When this case was last before this Court, CTC and Laumeister were found jointly and severally liable, but the Court made no determination as to the allocation of liability. *Browe*, 15 F.4th at 199. Instead, this Court remanded the issue to the District Court for consideration:

> The district court, however, did not address CTC's liability in either its merits or remedial opinions. While it is not entirely clear to us what Plaintiffs seek to gain from pursuing a judgment against a defunct corporation, they are entitled to judgment on each of their claims with respect to each named defendant. *We therefore direct the*

52

> *district court on remand to assess CTC's liability, if any,*
> *as to each of Plaintiffs' claims against it.*

*Id.* at 200 (emphasis added).

On remand, the District Court did not explicitly address or opine on this issue. While CTC is not liable for the reasons that follow, and thus an inquiry into CTC's liability is not necessary, should this Court determine that such an inquiry is necessary, a determination as to any allocation of liability to CTC is most appropriately made by the District Court, as this Court directed in 2021.

**B.** ***Neither this Court nor the District Court allocated any share of liability for contribution purposes to CTC.***

Any allocation of liability to CTC is contrary to principles of traditional trust law and, therefore, neither this Court nor the District Court allocated any liability to CTC. "[F]ederal Courts have been authorized to develop a federal common law under ERISA, and in doing so, are to be guided by the principles of traditional trust law." *Chemung*, 939 F.2d at 15. Under trust law, "even a breaching fiduciary should be entitled to the protection of contribution that has been traditionally granted fiduciary defendants." *Id.*

As discussed above, Launderville emailed Laumeister in April 2015 acknowledging that CTC was defunct, and instead sought payment of deferred compensation from Laumeister directly, which she "had counted on in retirement." SA8. As even Launderville acknowledged many years ago, CTC should not be

53

included in the allocation of liability, as they have not been since the initiation of this action in 2015.

**C.** ***Neither Laumeister nor CTC enjoyed any benefits as a result of a fiduciary breach, only Launderville did.***

Appellants argue that the purported benefits that Laumeister and CTC enjoyed as a result of the breach should be taken into account, misconstruing the law and facts on this issue. It is well settled that "if two or more trustees are liable for a breach of trust, they are jointly and severally liable, with contribution rights and obligations between or among them reflecting their respective degrees of fault . . . A trustee who benefited *personally* from the breach is not entitled to contribution to the extent of that benefit." Restatement (Third) of Trusts § 102 (2012) (emphasis added).

Section 102 of the Restatement (Third) of Trusts continues (with some adaptation) the rule and commentary of Restatement (Second) Trust § 258 (relied on by Appellants with the convenient exclusion of this commentary) as follows: "If two co-trustees participate in a breach of trust and are substantially equally at fault, one who makes good the breach is entitled to be reimbursed by the other for one-half of the liability." Restatement (Third) of Trusts § 102 (2012), comment b(1). Appellants conveniently excluded this additional commentary from their appeal brief, instead relying solely on the older § 258 of the Restatement (Second) of Trusts (1959), while improperly referring to the Restatement (Third) of Trusts later in their

brief (Appellants' Brief at p. 31).[4] The Third Restatement importantly adds the word "personally."

As the District Court properly determined, neither Laumeister nor CTC personally benefitted from the breach. SA9. Laumeister directed that Plan funds be used to cover operating costs for his failing company and ultimately used significant personal assets to keep the company afloat. SA9. No evidence exists in the record that CTC authorized the use of Plan funds for business operations. Perhaps if Laumeister's infusion of funds into CTC was successful at making the company profitable again, thus making Laumeister profitable again, he would have received a personal benefit from his breach. However, he instead suffered further losses due to CTC's continued decline and eventual dissolution. A215.

By contrast, Launderville was receiving benefits from the breach in the form of a substantial salary from CTC that was being paid, at least in part, from Plan assets that Launderville facilitated the use of to fund CTC's operating expenses. SA9. Although the District Court determined this was not a benefit to which she was not otherwise entitled, that is not entirely true. SA25. If the funds had not been improperly diverted in the first place, CTC would have had to shutter its doors sooner, meaning Launderville would have received fewer paychecks from CTC

---

[4] *See* SA34 at fn. 2 for the District Court's commentary on Appellants' stretching the bonds of zealous advocacy in the proceedings below.

during the period of its decline.  Therefore, liability should be split equally between Laumeister and Launderville, as the District Court correctly determined.  SA24.

Where, as here, an allegation of disproportionate fault is asserted that does not rise to the level where one party is substantially more at fault and therefore barred from obtaining contribution, a series of factors should be considered.  Restatement (Third) of Trusts § 102 (2012), comment b(1), (2).  Those factors include: (1) whether one trustee mislead the other(s) into joining in the breach; (2) whether one trustee committed the breach intentionally, while the other(s) did so by simple negligence; (3) whether one trustee, having greater experience or expertise, essentially controlled the actions of the other(s), such as where a trustee without business experience regularly relied on the judgment of the experienced trustee; and, (4) whether one trustee acted essentially alone while the joint and several liability of the other(s) resulted merely from a failure to exercise reasonable care to prevent the breach or from improper delegation or monitoring.  Restatement (Third) of Trusts § 102 (2012); *see also Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co.*, No. 3:11-CV-282 JCH, 2012 WL 10242276, at *17 (D. Conn. Sept. 27, 2012).

While Launderville and Laumeister were both liable, they were liable for different reasons.  SA24.  Launderville fraudulently induced Laumeister to use CTC Plan assets to pay CTC expenses, including her salary; she engaged in "classic self-dealing."  SA20.  Launderville acted intentionally.  SA22.  Launderville had

56

considerable control and discretion over management of the Plan. SA22. Launderville affirmatively violated her fiduciary duties; she did not act in reliance on the judgment of a more experienced trustee or because she was under the control of a more experienced trustee. *Browe*, 15 F.4th at 201; SA20. Her breach was not the result of an improper delegation or failure to exercise reasonable care. SA23. Launderville acted largely alone in breaching her fiduciary duty, although her actions required Laumeister's consent. SA22. Launderville, as the President of CTC handling the company's day-to-day operations, was the individual who completed the transactions that transferred Plan assets to fund CTC's operations. A218. Launderville also informed Laumeister of CTC's cash shortfalls, knowing that he would direct her to divert Plan assets into CTC's operating account. A215.

Laumeister, on the other hand, did not benefit personally from the breach and while he was the primary decision maker, the record undisputedly establishes that he acted based on "the erroneous belief that the Plan was a top hat plan which he could administer as he saw fit." SA23. Instead of engaging in self-dealing, he directed that Plan funds to be used to keep CTC a going concern and he continued to suffer losses due to CTC's enduring decline and eventual dissolution. A215.

Accordingly, no facts exist in the record that undermine the District Court's finding that Laumeister should be found more than 50% at fault. The District Court's determination that fault should be apportioned 50/50 between Laumeister and

Launderville follows applicable trust law and should be affirmed. SA24. In the alternative, should this Court determine that the extent of CTC's liability, if any, requires consideration by the District Court, this issue should be remanded.

## III. The District Court Accounted For All Growth In The Plan Fund Balance And Should Be Affirmed.

Contrary to Appellants' argument, the District Court correctly refused to allow any adjustment to the Plan's balance based upon Appellants' urging to use the actual year-2000 balance of $374,197. Appellants conveniently ignore this Court's 2021 ruling and mandate to the District Court to recalculate losses since 2004, **not** to find a different base amount as of a different date:

> [T]he district court's decision to limit damages on Plaintiff's fiduciary claims to the Plan's projected balance as of 2004 was error, and **damages must be recalculated to reflect the Plan's balance as it would have been had its funds been prudently invested through the date of judgment.**

*Browe*, 15 F.4th at 183–84.

Moreover, as this Court directed:

> [T]he district court's decision to limit the award to the amount that would have been in the Plan's account as of 2004 is irreconcilable with both the facts and the law. Had Laumeister effected a proper termination of the Plan, the Plan would have paid out all accrued benefits at the time of termination . . . those funds would have been insulated from CTC's decline by virtue of their being held in trust and would have **continued to generate returns** until they were distributed . . . we therefore vacate the restoration

58

> award [of $350,603 as of 2004] and **direct the district court to recalculate it in order to capture losses through the date of judgment**. On remand, the district court should presume that Plan funds 'would have been treated like other funds being invested **during the same period** in proper transactions' . . .

*Id.* at 198.

Appellants also disregard this Court's unequivocal deference to the District Court to determine the Base Amount, as made clear in the Court's 2021 decision:

> While Plaintiffs urge us to adopt the value proposed by their expert (whom the district court found credible, we believe the district court is better positioned to engage in this inquiry in the first instance and we remand the case to permit it to do so.

*Id.* at 199.

This Court need not and should not revisit this issue on appeal. The District Court's ruling on this issue should be affirmed.

59

## IV.   **Launderville And Browe's Claims For Benefits Were Not Timely And Are Barred By The Statute Of Limitations.**

As highlighted above, Appellants' argument that Browe and Launderville's claims for denial of benefits are not barred by the statute of limitations fails as a matter of law based on the extensive record in this case.  The District Court correctly determined that, based on the ample evidence presented below, both Browe and Launderville's claims for benefits were barred by the applicable six year statute of limitations.  That ruling should be affirmed.

ERISA does not prescribe a limitations period for commencement of actions arising under 29 U.S.C. § 1132(a)(1)(B) for recovery of benefits.  Rather, federal courts apply the most analogous state statute of limitations.  *Burke v. PriceWaterhouseCoopers LLP Long Term Disability Plan*, 572 F.3d 76, 78 (2d Cir. 2009).  As the District Court stated, the most analogous state statute of limitations is the limitations for breach of contract actions, which in Vermont and other states within the Second Circuit is six years.  *See* 12 V.S.A. § 511.

The District Court established in its Order dated December 16, 2022 that **as of February 2008**, Browe and Launderville both knew that CTC's cash flow was insufficient to pay its general creditors or to fund its deferred compensation Plan. SA17.  Because of this knowledge, Browe and Launderville sought to take advantage of their insider status to secure a side deal with Laumeister that was unavailable to other Plan participants.   SA17.   They approached Laumeister directly with the

understanding that rather than file suit, they could extract their Plan benefits from him personally based upon his promise to make them whole. SA17. Thus, Browe and Launderville's benefit claims brought in December of 2015 were not timely, and are barred by the statute of limitations, as correctly found by the District Court.

Also evident from the record below is that both Browe and Launderville possessed financial expertise as well as direct access to CTC's financial records, further evidence of their insider status. SA17; A215. Launderville was not only an officer and director of CTC, but also a Plan administrator who either attended or received the minutes of executive meetings. A205–A206. Although neither Browe nor Launderville received a written benefit request denial under ERISA, the evidence in the record demonstrates there was a clear repudiation of their claims to obtain benefits from the Plan, and rather than pursue their claims for such Plan benefits, they chose to seek reimbursement directly from Laumeister. SA17.

As this Court held in *Veltri v. Building Service 32B-J Pension Fund*, "[t]he relevant question is not the intention underlying [D]efendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action." 393 F.3d 318, 323 (2d Cir. 2004). A cause of action accrues upon a clear repudiation, regardless of whether the plaintiff has filed a formal application for benefits. *Abdul-Aziz v. NBA Players' Pension Plan*, 2019 WL 1284591, *4 (S.D.N.Y. March 20, 2019) (quoting *Carey v. Int'l Bhd. of Elec.*

61

*Workers Local 363 Pension Plan*, 201 F.3d 44, 49 (2d Cir. 1999) (internal quotations omitted).  A clear repudiation does not require a formal denial to trigger the statute of limitations, but rather repudiation occurs "when a beneficiary knows or should know he has a cause of action." *Miller v. Fortis Benefits Ins. Co.*, 475 F.3d 516, 521 (3d Cir. 2007).

In the case of Browe and Launderville, any reasonable person in their situation would have been aware of a cause of action, regardless of whether they had received a formal denial of benefits from CTC and regardless of whether they knew the precise legal claim to be advanced.  Browe and Launderville knew their individual claims for benefits would be denied by virtue of the fact that they knew the Plan account was exhausted and insufficient to fund the Plan.  Knowing this, Browe and Launderville approached Laumeister directly on multiple occasions to seek payment from him personally.  Browe and Launderville had multiple conversations and emails with Laumeister on this subject starting in 2008 and for years after, including efforts to be added into Laumeister's will, which came to fruition.  Browe and Launderville's benefit claims brought in December of 2015 were incontrovertibly untimely, and thus barred by the statute of limitations, as highlighted in above in the

arguments on cross-appeal and correctly found by the District Court.[5]  This Court should affirm that decision.

## CONCLUSION

For all of the foregoing reasons, CTC and Laumeister respectfully request that the Court grant CTC and Laumeister's Cross-Appeal in its entirety and deny Plaintiffs' Appeal in its entirety, resulting in the following relief:

a.    Affirm the District Court's ruling that Browe and Launderville's claims for benefits are barred by the applicable statute of limitations;

b.    Reaffirm this Court's prior finding that the Plan was never terminated and, therefore, reverse the District Court's erroneous ruling that 29 U.S.C. § 1344 applies to the distribution of Plan benefits;

c.    Reverse the District Court's erroneous award of benefits in the amount of $94,461.00 to Browe and $189,514.00 to Launderville, hold that they are not entitled to any benefits because their claims are time-barred and reduce the restoration award to $545,940.00;

d.    Reaffirm this Court's prior ruling that Launderville is a breaching co-fiduciary who engaged in "classic self-dealing" and, therefore, reverse the District Court's ruling that she is entitled to recover any benefits;

e.    If any benefits should be awarded to Launderville, which they should not, affirm the District Court's order allowing for offset of Launderville's benefits in contribution to Laumeister;

---

[5]  It should be noted that in addition to correctly finding that Browe and Launderville's claims for benefits are barred by the applicable six year statute of limitations, the District Court emphasized that Browe and Launderville are therefore not the prevailing party on those claims and may not recover attorney's fees when this case returns to the District Court to address the final issue of attorney's fees. SA34.  Rather, they may have an obligation to pay Cross-Appellants' attorney's fees on those issues.

f.  Affirm the District Court's 50/50 allocation of liability between Launderville and Laumeister with no liability allocated to CTC; affirm that Launderville is liable to Laumeister for one-half (1/2) of the restoration award; or, in the alternative, if the Court should determine that the allocation of liability to CTC must be further considered, remand to the District Court to consider same; and,

g.  Reaffirm this Court's prior ruling and mandate to the District Court to re-calculate the restoration award based on losses since 2004 through the date of Judgment and thus affirm the District Court's restoration calculation.

Dated:  April 22, 2024

### PRIMMER PIPER EGGLESTON & CRAMER PC

By:  */s/ Alexandra E. Edelman, Esq.*
Alexandra E. Edelman, Esq.
Ryan M. Long, Esq.
30 Main Street, Suite 500
Burlington, VT 05401
(802) 864-0880
aedelman@primmer.com
rlong@primmer.com

DEVINE, MILLIMET & BRANCH P.A.
Nicole Bodoh, Esq.
111 Amherst Street
Manchester, NH 03101
(603) 669-1000
nbodoh@devinemillimet.com

*Co-Counsel for CTC Corporation and Bruce Laumeister*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2)(A)(i) and 32(a)(7)(B)(i), and with Local Rule 28.1.1(a), because this brief contains 14,483 words, excluding items listed in Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface and style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated: April 22, 2024

PRIMMER PIPER EGGLESTON & CRAMER PC

By: */s/ Alexandra E. Edelman, Esq.*
Alexandra E. Edelman, Esq.

*Counsel for Defendants/Counter-Claimants/Appellees/Cross-Appellants CTC Corporation and Bruce Laumeister*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 22, 2024, I electronically filed the foregoing Brief of Defendants/Counter-Claimants/Appellees/Cross-Appellants CTC Corporation and Bruce Laumeister with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system, with paper copies to follow by mail.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, including:

John D. Stasny, Esq.
Woolmington, Campbell, Bent & Stasny, P.C.
4900 Main Street, PO Box 2748
Manchester Center, VT 05255
(802) 362-2560

Dated: April 22, 2024

PRIMMER PIPER EGGLESTON & CRAMER PC

By: */s/ Alexandra E. Edelman, Esq.*
Alexandra E. Edelman, Esq.
30 Main Street, Suite 500
Burlington, VT 05401
(802) 864-0880
aedelman@primmer.com

*Counsel for Defendants/Counter-Claimants/Appellees/Cross-Appellants CTC Corporation and Bruce Laumeister*

66